**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

————————————————————
                                              :
YOGO FACTORY FRANCHISING, INC.,   :
                                              :
            Plaintiff,                        :
                                              :
                              v.              :
                                              :
EDMOND YING, et al.,                  :
                                              :
            Defendants.               :
                                              :
and                                           :
                                              :       Civil Action No. 13-630 (JAP) (TJB)
EDMOND YING, et al.                   :
                                              :       **OPINION**
            Counterclaimants,       :
                                              :
                              v.              :
                                              :
YOGO FACTORY                       :
FRANCHISING, INC., et al.,             :
                                              :
            Counterclaim Defendants.  :
————————————————————:

PISANO, District Judge.

This matter comes before the Court on a motion to dismiss Defendants Edmond Ying,

Nancy Canon-Ying, and OMG Froyo, LLC's  (hereinafter "Defendants") Counterclaim by

Plaintiff/Counterclaim Defendants Yogo Factory Franchising, Inc. ("YFF"), Yogurt Werks, Inc.

("YWI"), Brian Petruzzi, and Ryan Mastro (together, the "YFF Parties") pursuant to Fed. R. Civ.

P. 12(b)(6) and/or Fed. R. Civ. P. 9(b).  In its Complaint, YFF, a franchisor, has brought claims

for trademark infringement, unfair competition, misappropriation of trade secrets, breach of a

certain franchise agreement, and tortious interference against Defendants, a franchisee, his wife,

and a company formed and owned by his wife.  Defendants now counterclaim that the YFF

Parties fraudulently induced Ying into entering into three franchise agreements.  The Court decides this matter without oral argument pursuant to Fed. R. Civ. P. 78(b).  For the reasons set forth below, the YFF Parties' Motion to Dismiss Defendants' Counterclaim is granted.

I.     **Background**

      A.     **The Parties**

Yogurt Werks, Inc. ("YWI") is a corporate entity organized pursuant to the laws of the State of New Jersey in June 2011 and maintains its principal place of business within New Jersey.  Yogo Factory Franchising, Inc. ("YFF") is a New Jersey corporation with its principal place of business in Galloway, New Jersey.  It was organized in February of 2012.  YFF is a franchisor of the Yogo Factory franchise system (the "System"), offering the right to open and operate frozen yogurt stores operating under the licensed mark Yogo Factory.  YWI is an affiliate of YFF.  Brian Petruzzi is alleged to be the CEO and president[1] of YFF, a position he has held since YFF's inception in February 2012.  He is also alleged to be the president and CEO of YWI.  Ryan Mastro is YFF's Franchise Coordinator, and has served in that position since YFF's inception in February 2012.

Edmond Ying is a New Jersey citizen and resident who entered into three Franchise Agreements with Plaintiff and/or YWI to open and operate three Yogo Factory stores.  OMG Froyo, LLC is a New Jersey limited liability company formed by Nancy Canon-Ying, Ying's wife, in November 2012.

---

[1] In its Complaint, YFF names Petruzzi as its "principal."

B.     **Factual Background[2]**

1.     The Howell Store

In August 2011, Ying contacted YWI and expressed an interest in purchasing a Yogo Factory franchise.   On or about August 30, 2011, Petruzzi emailed Ying a document entitled "Yogurt Werks, Inc. d/b/a/ Yogo Factory Frozen Yogurt Franchise Information and Disclosure Package" (hereinafter the "Howell FDD").   The Howell FDD cautions prospective franchisees to "to rely *only* on information contained in this memorandum in reaching a franchise licensing investment decision" and that "[t]he franchise license is speculative and involves a high degree of risk.  A license should be purchased only by those who can afford to risk their loss of their entire investment."  *See* Countercl. Ex. B at 4.  It states that there are currently two company owned stores, and that no franchised stores currently exist.  Defendants allege that this FDD did not follow the "prescribed methods of providing required information to Ying;" for example, they specify that the Howell FDD did not include separately indicated sections.

Along with the Howell FDD, Defendants allege that Petruzzi also made various representations to Ying before he purchased the Howell Store.  These representations include information regarding the yearly sales of a Yogo Factory franchise; that a franchisee could rely on provided sales and financial information, and did not need retail or business experience to succeed; that YFI would provide advertising and appropriate, effective pre-opening services; that the Yogo Factory brand was being aggressively promoted and was expanding; that YWI would continue to develop the reputation and good will associated with the Yogo Factory name; and that YWI would provide "complete support" to franchisees after opening their franchise stores. These representations do not exist within the Howell FDD.

---

[2] The following allegations are summarized from the Counterclaim, and must be taken as true in deciding this Motion to Dismiss.  *See Newman v. Beard*, 617 F.3d 775, 779 (3d Cir. 2010).  Certain factual allegations from the Complaint are not included here, as they are not relevant to this Motion.

3

Defendants allege that Ying paid YWI $25,000 as an initial franchise fee on or about September 25, 2011 to develop a franchise in Howell, New Jersey (the "Howell Store").  On or about October 14, 2011, Ying entered into a franchise agreement (the "Howell Franchise Agreement") with YWI.  Relevant for purposes of this motion, Section 9 of the Howell Franchise Agreement states:  "This Agreement is made in New Jersey.  Any disputes arising from this Agreement (except the restrain provisions of Paragraph 6) shall be subject to arbitration in New Jersey under the Rules and auspices of the American Arbitration Association or other mutually agreeable arbitrator."  *See* Pl.'s Br. Ex. A at 24.[3]

2. The Galloway Store

During April 2012, Petruzzi and Ying entered into an agreement for Ying to purchase Petruzzi's personally-owned Yogo Factory store in Galloway, New Jersey (the "Galloway Store").  Defendants allege that Petruzzi made the same exact eight representations[4] to Ying about the Galloway Store before he purchased it, which accordingly do not exist within the FDD.

On or about April 2, 2012, Mastro emailed Ying a franchise disclosure document (the "Galloway FDD") for his review.   The Galloway FDD "summarizes certain provisions of [the] franchise agreement and other information in plain English."  *See* Countercl. Ex. C at 1.  While the Galloway FDD is lengthy, only a few provisions are relevant for this motion.  First, in Item 3 of the Galloway FD, the potential franchisee is informed that Petruzzi was involved in two prior litigations.  *See id.* at 4.  Next, Item 7 of the Galloway FDD estimates the initial investment funds necessary to open a Yogo Factory store, but cautions that the numbers listed are estimates only

---

[3] The Court will consider the Howell Franchise Agreement, attached as Exhibit A to the Moving Brief, because it explicitly forms the basis of part of Defendants' Counterclaim.  Further, Defendants do not dispute the authenticity of the Howell Franchise Agreement, and indeed rely on it in their Opposition Brief.

[4] As noted by the YFF Parties, Defendants allege that Petruzzi represented that the franchisees' average sales were $685,000 when he made these representations to Ying regarding the Galloway Store, but represented that the franchisees were making $650,000 in average sales when he was making these same representations to Ying in regards to the Howell Store.

4

and there is no guarantee that a franchisee's costs will fall within the states ranges.  The Galloway FDD advises the potential franchisee that he or she is responsible for obtaining certain insurance policies, including workers' compensation insurance. *Id.* at 11.  The Galloway FDD reminds the potential franchisee that estimates are for initial start-up costs only, and do not include ongoing costs for things such as marketing and advertising expenses.  *Id.* at 12.  In Item 11, the Galloway FDD states that the franchisor will provide a training program to the franchisee and its manager, and that it may provide other training programs after the opening of the franchisee store, if deemed advisable.  *Id.* at 20, 22-23.   It also states that an operations manual will be provided.  *Id.* at 24.

In Item 19 of the Galloway FDD, certain financial performance representations are made, pursuant to the Federal Trade Commission's ("FTC") Franchise Rule.  The Section explains that "financial performance information that differs from that included in Item 19 may be given only if…a franchisor provides the actual records of an existing outlet you are considering buying." *Id.*at 38.  It explains that the historical performance representation is based upon the two affiliate-owned stores in New Jersey, which have limited operating history, having first opened in 2011.  It also states that there are no currently franchised locations as of February 2012.  The Section later emphasizes this point:

> CAUTION:  ONLY THE TWO COMPANY STORES LISTED IN THIS ITEM ACHIEVED THE REPORTED RESULTS.  YOUR INDIVIDUAL RESULTS MAY DIFFER.  THERE IS NO ASSURANCE YOU WILL SELL AS MUCH OR THAT YOUR COSTS AND EXPENSES WILL NOT EXCEED THOSE PROVIDED IN THIS ITEM.
>
> YOU ARE STRONGLY ADVISED TO CONDUCT AN INDEPENDENT INVESTIGATION OF THE COSTS AND EXPENSES YOU WILL INCUR IN OPERATING YOUR FRANCHISED BUSINESS.

*Id.* at 41.  The Section twice cautions that "we do not make any representations about any Store's past, current or future financial performance. . . . We do not authorize our employees or representatives to make any such representations either orally or in writing."  *Id.* at 38, 41.  The only exception made is "[i]f you are purchasing an existing Store…we may provide you with the actual records of that store."  *Id.*  The Section also takes care to list out different ways in which sales or costs may be affected.  *Id.* at 40-41.   It stresses that the franchisor "cannot and do[es] not guarantee that you will not have different or additional expenses starting your business."  *Id.* at 10, 12.  It suggests, numerous times, for a potential franchisee to review the figures with a business advisor before making a decision to purchase the franchise.  *Id.* at 1, 10, 12, 38, 41.

Along with the Galloway FDD, Defendants allege that Mastro emailed to Ying the Galloway Store's cash flow and expense statements on April 23, 2012 to "further persuade Ying" to purchase the store.  Countercl. ¶ 27.  These statements suggested that the Galloway Store's financial performance was "outstanding."  *Id.* at ¶ 26, 28.  Defendants allege that Petruzzi and Mastro both represented to Ying that the Galloway Store was "'turn key' in that its staff could operate the location on their own with little to no supervision" and that Ying could therefore be an "absentee franchisee-owner."  *Id.* at ¶ 25.

Defendants allege that Ying entered into a "Business Sale Agreement" with Petruzzi to purchase the Galloway Store for $650,000 on April 25, 2012.  Ying thereafter delivered $325,000 to YFF on April 29, 2012.  After approximately a month of operating the Galloway Store, Ying became frustrated with the performance of the store.  On June 1, 2012, Ying entered into an agreement with Petruzzi to sell the Galloway Store back to Petruzzi for $325,000, payable in $27,083 monthly installments.

3.    The Manahawkin Store

On June 2, 2012, Ying entered into another Franchise Agreement with YFF, in which he was granted the right to open and operate a third Yogo Factory store in Manahawkin, New Jersey (the "Manahawkin Store").  Ying was allegedly not given a FDD prior to his purchase of the Manahawkin Store.  Defendants allege that, at some point before he purchased the Manahawkin Store, Petruzzi and Mastro made the same eight representations to Ying "to induce him into purchasing another franchise."   Countercl. at ¶ 34.

The Manahawkin Franchise Agreement contain a provision that the written contract constitutes the entire agreement between the parties and that "no other representations hav[e] induced you to execute this Agreement," but that "nothing in this Agreement is intended to disclaim the representations YFF made in the franchise disclosure document YFF furnished to you."  Another provision states that the franchisee has conducted an independent investigation of the franchise business, and realizes the business venture involves risk.  It continues:

> Your success in this business is not guaranteed, is speculative and depends, to an important extent, upon your ability as an independent business person.  YFF does not represent or warranty that the Store will achieve a certain level of sales or be profitable. . . .YFF expressly disclaims the making of, and you acknowledge you have not received, any warranty or guarantee, express or implied, as to the potential volume, profits or success of the business venture contemplated by this Agreement.

*See* Compl. Ex. B at 46-47.  The franchise agreements contain a "franchise disclosure questionnaire" that Ying signed on June 5, 2012. The questionnaire asks the following questions:

> Has any employee or other person speaking on behalf of YFF made  any statement or promise concerning the revenue, profits or operating costs of YFF [*sic*] store or business operated by YFF or its franchisees except as expressly provided in Item 19 of the Franchise Disclosure Document?
>
> Has any employee or other person speaking on behalf of YFF made any statement or promise concerning a Yogo Factory store, kiosk or cart that is contrary to, or different from, the information contained in the Disclosure Document?

> Has any employee or other person speaking on behalf of YFF made any statement or promise regarding the amount of money you may earn in operating a Yogo Factory store or business?
>
> Has any employee or other person speaking on behalf of YFF made any statement, promise or agreement concerning the advertising, marketing, training, support service or assistance that YFF will furnish to you that is contrary to, or different from, the information contained in the Disclosure Document?

Ying answered "No" to each of these questions. The questionnaire also asked if the franchisee "understand[s] that the approval of YFF of the Approved Store Location for a Yogo Factory store does not constitute an assurance, representation, or warranty of any kind as to the successful operation or profitability of a Yogo Factory store at the Approved Store Location?" Ying answered "Yes" to this question. *See* Compl. Ex. B at Ex. 8. The Manahawkin Store opened on August 11, 2012.

### C. Defendants' Counterclaim

In their Counterclaim, Defendants have brought claims for fraud, negligent misrepresentations, civil RICO, a violation of the New Jersey Consumer Fraud Act ("NJCFA"), breach of contract, and malicious use and abuse of process against the YFF Parties. The basis of this Counterclaim appears to be that Ying was induced into purchasing three Yogo Factory franchises, which have allegedly not earned what they were represented to earn. Defendants further allege that certain costs, such as building-out the stores and food inventory, were higher than indicated. Defendants also claim that Ying was misled about the profits it would make because Ying was not told that the stores would be required to accept certain coupons from customers that reduced their profit margin. Defendants further claim that YFF did not provide effective advertising and did not provide adequate assistance in Ying's build-out of the Howell

and Manahawkin Store.  They also claim that the YFF Parties did not disclose certain insurance expenses, and that Ying was never provided with an operations manual or with training.

## II.    <u>Standard of Review</u>

When deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must first separate the factual and legal elements of the claims, and accept all of the well-pleaded facts as true.  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).  All reasonable inferences must be made in the non-movant's favor.  *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010).  The Court then determines whether the pleading at issue "contain[s] sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

Specifically, when assessing the sufficiency of a civil complaint, a court must distinguish factual contentions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.  Any legal conclusions are "not entitled to the assumption of truth" by a reviewing court.  *Id*. at 679.  Rather, "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id*.

In addition, Rule 9(b) requires that "in all averments or fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."  Fed. R. Civ. P. 9(b).  Rule 9(b)'s heightened pleading standard for fraud claims is meant "to place the defendants

on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Seville Indus. Mach. v. Southmost Mach.*, 742 F.2d 786, 791 (3d Cir. 1984). In general, the complaint must describe the "who, what, when, where and how of the events at issue." *In re Rockefeller Ctr. Props. Secs. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (citations and quotations omitted).

Generally, our task in assessing a motion to dismiss requires it to disregard any material beyond the pleadings. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). The court, however, may consider "a document integral to or explicitly relied upon in the complaint," whether or not the document is attached to the challenged pleading. *Id.* (internal quotation marks and citation omitted). Furthermore, a court need not accept allegations as true that are contradicted by the documents upon which a party's claims are based. *See Warburton v. Foxtons, Inc.*, Civil Action No. 04-2474, 2005 U.S. Dist. LEXIS 39615, at *10 (D.N.J. June 13, 2005) (citing *Genesis Bio-Pharmaceuticals, Inc. v. Chiron Corp.*, 27 F. App'x. 94, 99-100 (3d Cir. Jan. 10, 2002)).

## IV.    Discussion

### A.    The Howell Store Franchise Agreement Arbitration Clause

As discussed, under Section 9 of the Howell Franchise Agreement, YWI and Ying agreed that "[a]ny disputes arising from this Agreement (except the restraint provisions of Paragraph 6) shall be subject to arbitration in New Jersey under the Rules and auspices of the American Arbitration Association or other mutually agreeable arbitrator." Pl.'s Br. Ex. A at 24. The YFF Parties argue that, pursuant to this arbitration provision, all the claims relating to the Howell Franchise Agreement must be dismissed, and arbitration should be compelled. In their Opposition, Defendants agree that all contractual claims stemming from the Howell Franchise

Agreement should be arbitrated, but that any tort or statutory claims relative to the Howell Agreement should be determined by this Court.

In considering the propriety of arbitration, a court must make "a two-step inquiry into (1) whether a valid agreement to arbitrate exists and (2) whether the particular dispute falls within the scope of that agreement." *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005). There is a presumption in favor of arbitrability when determining both the existence and scope of an arbitration agreement. *See id.* Here, Defendants concede that there is a valid agreement to arbitrate. Therefore, the Court must determine whether Defendants' tort and statutory claims fall within the scope of the arbitration provision.

Here, the language of the arbitration clause states that disputes "arising from" the Howell Franchise Agreement must be arbitrated. Defendants argue that the provision should be interpreted narrowly because is excludes from arbitration the "restraint provisions of Paragraph 6," which relate to certain proprietary information and property and intellectual property of the franchisor. The Court disagrees. The Third Circuit gives "an expansive interpretation to 'arising from.'" *Medtronic AVE Inc. v. Cordis Corp.*, 100 F. App'x 865, 868 (3d Cir. 2004) (quoting *Battaglia v. McKendry*, 233 F.3d 720, 727 (3d Cir. 2000) ("[W]hen phrases such as 'arising under' and 'arising out of' appear in arbitration provisions, they are normally given broad construction."). While Defendants argue that the provision is restrictive because it excludes a certain category of disputes, the Third Circuit has found that such exclusionary language confirms a broader reading of an arbitration provision precisely because "something can be excluded only if it would be otherwise included." *Medtronic AVE Inc.*, 100 F. App'x at 868. It follows, therefore, that the disputes must otherwise be "a subset of the larger set of disputes" arising from the Franchise Agreement. *Id.*

11

Therefore, the Court finds that Defendants' tort and statutory claims fall within the scope of the Franchise Agreement.  It is well-established that "[i]f the allegations underlying the claims touch matters covered by [an arbitration provision], then those claims must be arbitrated, whatever the legal labels attached to them." *Brayman Constr. Corp v. Home Ins. Co.*, 319 F.3d 622, 626 (3d Cir. 2003).  Here, Defendants' counterclaims pertaining to the Howell Store revolve around the Howell Franchise Agreement; for example, Defendants claim that Petruzzi fraudulently induced Ying to enter into the Howell Agreement based upon certain representations made to him.  Such claims clearly "arise from" the Howell Agreement.  *See Launch Fitness, LLC v. GoPerformance Franchising, LLC*, 2013 U.S. Dist. LEXIS 41913, at *8-9 (D.N.J. Mar. 26, 2013) (finding that that plaintiffs were fraudulently induced to enter into a franchise agreement fell under an arbitration clause as a claim "arising from" the agreement). Overall, "[a]n order to arbitrate should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Medtronic AVE Inc. v. Advanced Cardiovascular Sys.*, 247 F.3d 44, 55 (3d Cir. 2001) (quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960)).  Here, it could not be plausibly said–nevertheless said with "positive assurance"–that the "arising from" language of the provision does not require arbitration of the tort and statutory claims.  Therefore, all claims relating to the Howell Franchise Agreement are dismissed, and the parties are ordered to submit these claims to arbitration in accordance with the terms of their agreement.

### B.    Defendants' Fraud Claim

Count One of Defendants' Counterclaim is for fraud.  In order to establish a claim for fraud, Defendants must establish: "(1) a material misrepresentation of a presently existing or past

fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person and (5) resulting damages." *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997).  Even when reviewing the Counterclaim in the light most favorable to the Defendants, the claim must be dismissed.

First, a fraud claim must be pleaded with particularity.  This heightened pleading standard can be met by "alleging the identity of the person who made the alleged representation, the general content of the representation, along with the date, place, and time the representation was made." *Bintliff-Ritchie v. Am. Reinsurance Co.*, 2007 U.S. Dist. LEXIS 10469, at *15-16 (D.N.J. Feb. 15, 2007) (citing *Lum v. Bank of America*, 361 F.3d 217, 224 (3d Cir. 2004)).  Here, Defendants' general allegations of fraud do not comply with Rule 9(b).  Defendants have alleged one broad claim of fraud as to all the YFF Parties in connection with all the transactions that are at issue in this case.  This is insufficient.  For example, Defendants have asserted that the YFF Parties "made misrepresentations knowing their statements were false."  Countercl. ¶ 56. Defendants, however, fail to specify which member of the YFF Party made what alleged misrepresentation and when.  Defendants have referenced that these material misrepresentations relate to the "financial performance of franchises," but have not specified anywhere exactly what was materially misrepresented.  Further, while Defendants have pointed to the list of representations that Petruzzi and/or Mastro made to Ying before he purchased each stores as examples of misrepresentations, these allegations give no indication of when these statements took place, or how these misrepresentations were conveyed to Ying.  Additionally, Defendants claim that Ying "reasonably relied on the misrepresentations in purchasing the Yogo Factory franchises," but fail to allege what misrepresentations Ying has relied on for which store.  In sum, Defendants' fraud claim is almost entirely made of legal conclusions, leaving the YFF

Parties to guess at the "who, what, when, where and how of the events at issue." *In re Rockefeller Ctr. Props. Secs. Litig.*, 311 F.3d at 217.

However, even if Defendants' fraud claim was pled with particularity, it would still fail to state a claim. The crux of the Defendants' claim appears to be that the YFF Parties misrepresented the amount of money Ying's franchises would generate and the amount of support the franchisors would provide. *See* Opp. Br. at 15-16. The YFF Parties argue that Defendants cannot establish reasonable reliance on a material misrepresentation, in light of the express provisions of the franchise agreements and the language of the FDD.

As Defendants concede, only the Howell Franchise Agreement does not contain an integration clause. *See* Opp. Br. at 14-15. The other franchise agreements entered into between the parties contained integration clauses. *See* Compl. Ex. B at 45. Specifically, the agreement states that it constitutes "the entire, full and complete Agreement" between the parties, and that it "supersedes all prior agreements." It goes on to state that "no other representations hav[e] induced you to execute this Agreement." The agreement also makes clear that the investment in a franchise includes a large amount of risk and that any success is speculative, and therefore requires an independent investigation of the franchise business. Defendant Ying also completed and signed the franchise disclosure questionnaire, the purpose of which was "to determine whether any statements or promises were made to you that [YFF] has not authorized and that may be untrue, inaccurate, or misleading." *See* Compl. Ex. B at Ex. 8. By signing this document, Ying represented that no person speaking on behalf of YFF made any promise concerning the revenue, profits, or operating costs of a YFF store, except as expressly provided in Item 19 of the FDD. *See id.* He also represented that no employee or person speaking on behalf of YFF made any sort of promise concerning the likelihood of success or profitability he

may achieve operating a Yogo Factory store, and that no person made any statement concerning the advertising or training that YFF will furnish to him that is different from what was contained in the FDD.  *Id.*

Therefore, the Court finds that Ying's reliance on the YFF Parties alleged prior representations is not reasonable based upon the integration clause in the franchise agreements and the franchise questionnaire.  Courts in this District have held that integration clauses or disclaimers in franchise agreements make "alleged reliance on any prior representations not contained in the Franchise Agreements…unreasonable as a matter of law."  *Jackson Hewitt Inc. v. Childress*, No. 06-0909, 2008 U.S. Dist. LEXIS 24460, at *32 (D.N.J. Mar. 21, 2008); *see also Wingate Inns Int'l, Inc. v. Swindall*, No. 12-248, 2012 U.S. Dist. LEXIS 152608, at *5-7 (D.N.J. Oct. 23, 2012); *Ramada Franchise Sys. v. Eagle Hospitality Grp.*, No. 03-3585, 2005 U.S. Dist. LEXIS 45102, at *27 (D.N.J. June 24, 2005).  Likewise, here, Ying cannot reasonably allege that he relied on any prior oral representations that may have been made to him, as the franchise agreement he signed contained an integration clause that specifies that it is the entire agreement between the parties, that no other representations induced him into signing the agreement, and that the agreement superseded all earlier agreements.  Furthermore, he represented and acknowledged that no other promises or warranties had been made to him regarding the possible success or profitability of his stores, and that he understood the great amount of risk and speculation involved with undertaking this business venture.

Defendants argue that Ying could rely on the information appearing in the FDD he received because the integration clause states that "nothing in this Agreement is intended to disclaim the representations YFF made in the franchise disclosure document. . . ."  *See* Compl. Ex. B at 45.  Defendants contend that the financial performance representations were materially

misleading.  This argument also fails.  Item 19 (and indeed, the entire FDD) makes clear of the risk and speculation involved with opening a store, warning that there are only two company stores that have been open for less than a year and that an individual franchisee's results may differ.  It expressly states that "[t]here is no assurance you will sell as much or that your costs and expenses will not exceed those provided in this item" and that "[t]here is no assurance that you'll earn as much," and "strongly advise[s]" a potential franchisee to conduct an individual investigation.  *See* Countercl. Ex. B at 38, 41.  It details many ways in which a potential franchisee's sales and costs could be affected.  *See id.* at 39-41.  Item 19 also cautions that the YFF "do[es] not make any representations about  franchisee's future financial performance."  *Id.* at 41.  Furthermore, to the extent that Defendants have alleged that the costs of building out the Manahawkin Store were understated in Item 7 or that the costs of food were understated in the agreement, the FDD makes clear that these numbers are estimates.  Such predictions of future events are not actionable under a fraud claim, because they are not a statement of present or past fact.[5]  *See Baer v. Chase*, Civil Action No. 02-2334, 2004 U.S. Dist. LEXIS 3954, at *30-31 (D.N.J. Feb. 20, 2004); *Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 435 (D.N.J. 1997) ("Statements as to future or contingent events, to expectations or probabilities, or as to what will or will not be done in the future, do not constitute misrepresentations, even though they may turn out to be wrong.").  Therefore, Defendants cannot plausibly argue that Ying reasonably relied upon these estimates of earning potential or of start-up costs.

Defendants appear to also allege that part of their fraud claim is based upon the alleged failure of the YFF Parties to comply with applicable FTC franchise disclosure rules.  *See* 16 C.F.R. § 436.1 *et seq.* [hereinafter, the "FTC Rule"].  This effort to incorporate the specific

---

[5]This reasoning also applies to Defendants' allegations regarding the number of new franchised stores that the YFF Parties anticipated opening within the coming year.

prohibitions and requirements of the FTC Rule into a fraud claim "is in effect an attempt by a private party to enforce the terms of [the FTC Rule] against another private party." *Vino 100, LLC v. Smoke on the Water, LLC*, 864 F. Supp. 2d 269, 281 (E.D. Pa. 2012).  However, "[t]t is well settled that there is no a private cause of action for violation of the FTC franchise disclosure rules."[6] *Robinson v. Wingate Inns Int'l, Inc.*, No.: 13-2468, 2013 U.S. Dist. LEXIS 179997, at *5-6 (D.N.J. Dec. 20, 2013) (citing *Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.*, 902 F.2d 222, 231 (3d Cir. 1990) (noting that the FTC statute does not create "an express or implied private right of action")); *see also Holloway v. Bristol-Myers Corp.*, 485 F.2d 986, 987 (D.C. Cir. 1973) ("[P]rivate actions to vindicate rights asserted under the Federal Trade Commission Act may not be maintained."); *Vino 100*, 864 F. Supp. 2d at 281.  Therefore, Defendants cannot base their fraud claims on such an alleged violation.

The few remaining allegations that Defendants point to as examples of material misrepresentations are also insufficient.  If anything, these allegations form the basis of a claim for breach of contract.  Here, for example, Defendants have alleged that the YFF Parties did not provide an operations manual or training in the manner set forth in the FDD, that the YFF Parties failed to provide "adequate specifications and design assistance" with the build-out of two of Ying's stores, and that the YFF Parties failed to provide adequate  advertising.  Such obligations of YFF are set forth in the franchise agreements.  Any failure to comply with these obligations does not constitute fraud.[7]  Claims for fraud in the performance of a contract are not cognizable

---

[6] Furthermore, even if Defendants could plausibly use a violation of the FTC Rule as the basis for a fraud claim, their allegations would still fail.  Under Item 19, a franchisor is permitted to provide financial performance information that differs from that included within Item 19 if it is "the actual records of an existing outlet [the franchisee] is considering buying. . . ."  Here, Defendants have asserted that the Galloway Statements were unlawful earnings claims under the FTC Rule; however, the Galloway Statements could be provided to Ying because they fall within this exception.

[7] As the YFF Parties point out, most of these alleged contractual obligations are not promises of performance by YFF.  For example, YFF's pre-opening obligations are specifically delineated in the franchise agreement in Articles 2, 4, 6, and 7, as well as summarized in the FDD.  With the exception of these expressly disclosed obligations, YFF

under New Jersey law.  *See Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 144 (3d Cir. 2001).

"Broken promises that relate to the performance of a contract are breaches of contract, not fraud

claims."  *Atl. City Assocs. LLC v. Carter & Burgess Consultants, Inc.*, No. 05-3227, 2007 U.S.

Dist. LEXIS 72649, at *17-18 (D.N.J. Sept. 28, 2007) (citing *Bracco Diagnostics, Inc. v. Bergen

Brunswig Drug Co.*, 226 F.Supp.2d 557, 564 (D.N.J. 2002)).  Finally, Defendants have also

alleged what appear to be allegations of certain fraudulent omissions by the YFF Parties.  First,

Defendants have alleged that the requirement to accept certain coupons from customers was not

disclosed to Ying.  As the YFF Parties point out, either YFF had the contractual right to require

Ying to honor coupons or it did not.  Either way, this allegation forms the basis of a possible

contract claim, if anything.  Next, Defendants allege that the requirement to purchase workers'

compensation insurance was never disclosed to Ying.  This allegation is refuted by the express

terms of both the franchise agreements and the FDD.

    Therefore, Defendants have failed to allege a plausible claim for fraud.  Not only does

their claim for fraud fail to reach the heightened pleading requirements under Rule 9(b), but

Defendants have also failed to allege reasonable reliance on any misrepresentations by the YFF

Parties.  Because Defendants have failed to sufficiently allege fraud, Count One is dismissed.

    **C.**    **Defendants' Negligent Misrepresentation Claim and Civil RICO Claim**

    Count Two of Defendants' Counterclaim alleges negligent misrepresentation by the YFF

Parties.  A claim for the tort of negligent misrepresentation requires "an incorrect statement,

negligently made and justifiably relied upon" and damages sustained as a result of that reliance.

*H. Rosenblum, Inc. v. Adler*, 93 N.J. 324, 334 (1983).  Because "[t]he element of reliance is the

---

was "not required to provide you with any other assistance or service before you open your Store."  *See* Countercl. Ex. C at 24; *see also* Compl. Ex. B at 10 (explaining pre-sale obligations, and that any additional supervision by YFF will be provided on the "sole discretion" of YFF).  Furthermore, many of the allegations pertain to alleged broken promises by YWI, which was not a party to either the Galloway Business Sale Agreement or Manahawkin Franchise Agreement.

same for fraud and negligent misrepresentation," *Kaufman v. I-Stat Corp.*, 165 N.J. 94, 109

(2000), Defendants' counterclaim for negligent misrepresentation must also be dismissed.

Similarly, Defendants' failure to plausibly allege fraud dooms Defendants' claim for civil RICO,

which is predicated on mail and wire fraud.  *See Lum v. Bank of Am.*, 361 F.3d 217, 223-24 (3d

Cir. 2004).  Therefore, Counts Two and Four of Defendants' Counterclaim must be dismissed.

### D.     Defendants' NJCFA Claim

Defendants have alleged a violation of the New Jersey Consumer Fraud Act (the

"NJCFA") in Count Three of their Counterclaim.  The NJCFA "provides a private cause of

action to consumers who are victimized by fraudulent practices in the marketplace."  *Gonzalez*

*v. Wilshire Credit Corp.*, 207 N.J. 557, 576 (2011) (citing *Lee v. Carter-Reed Co.*, 203 N.J. 496,

521 (2010)).  Accordingly, the NJCFA is intended to protect consumers who purchase "goods or

services generally sold to the public at large."  *Marascio v. Campanella*, 298 N.J. Super. 491,

499 (App. Div. 1997).  "The entire thrust of the Act is 'pointed to products and services sold to

consumers in the popular sense.'"  *Arc Networks, Inc. v. Gold Phone Card Co., Inc.*, 756 A.2d

636, 638 (Law Div. 2000) (quoting *Neveroski v. Blair*, 141 N.J. Super. 365, 378 (App.

Div.1976)).  The YFF Parties argue that this claim should be dismissed because a franchise such

as Yogo Factory is not consumer merchandise that is typically offered for sale to the public at

large.  The Court agrees.

The Third Circuit has specifically held that the NJCFA does not apply to the sale of

franchises, explaining that

> even where franchises or distributorships are available to the public at large in the
> same sense as are trucks, boats or computer peripherals, they are not covered by
> the [NJCFA] because they are businesses, not consumer goods or services. They
> never are purchased for consumption. Instead, they are purchased for the present
> value of the cash flows they are expected to produce in the future and…bear no

resemblance to the commodities and services listed in the statutory definition of "merchandise" or the rules promulgated by the Division of Consumer Affairs.

*J & R Ice Cream Corp. v. California Smoothie Licensing Corp.*, 31 F.3d 1259, 1274 (3d Cir. 1994). Defendants argue that the sale of the Yogo Factory franchise does fall into the gambit of the NJCFA because the franchise was sold to the general public. *See* Opp. Br. at 9-10. The Court disagrees. First, Defendants' argument is based upon their claim that YFF "used general advertising over the internet to solicit and sell franchises." Opp. Br. at 10. This allegation, however, is notably missing from the Counterclaim and was raised for the first time in their Opposition Brief. Therefore, it cannot appropriately form the basis of any of their claims nor be considered by a court in determining the sufficiency of a party's counterclaims under Rule 12(b)(6). *See, e.g.*, *Frederico v. Home Depot*, 507 F.3d 188, 201-02 (3d Cir. 2007); *Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.").

Even if the Court were to consider this allegation, the claim still fails as a matter of law. The Court is mindful of *Kavky v. Herbalife Int'l of Am.*, 359 N.J. Super. 497, 498-99 (App. Div. 2003), which rejected the rule in *J&R Ice Cream*. This Court, however, is obligated to follow the Third Circuit's prediction of New Jersey law, notwithstanding New Jersey Appellate court decisions to the contrary, in the absence of a definitive statement by the New Jersey Supreme Court. *See Debiec v. Cabot Corp.*, 352 F.3d 117, 131 (3d Cir. 2003). Furthermore, *Kavky* is factually distinguishable from this case. In *Kavky*, the franchisor at issue offered to "make anyone a distributor in return for $85 and to provide 'Pre-Paid Retail Internet Customers' at $8.50 per customer." *Kavky*, 359 N.J. Super. at 498. There, where the franchisor was contracting with "anyone" to provide costumer inventory for a set amount per costumer, the franchisee was more akin to a traditional consumer than here, where a franchisee is "purchasing the use of a

20

mark more generally."[8]  *Wingate Inns Int'l, Inc. v. P.G.S., LLC*, No. 09-6198, 2012 U.S. Dist. LEXIS 115745, at *25-26 (D.N.J. Aug. 16, 2012); *see also Swindall*, 2012 U.S. Dist. LEXIS 152608, at *12.  The *Kavky* Court also noted that it did not disagree with the result in *J&R Ice Cream* because "it appears to have involved a substantial and complex commercial transaction." *Kavky*, 359 N.J. Super. at 501.  The complexity of the transaction between the parties here puts this case squarely in the realm of *J&R Ice Cream*.  Therefore, regardless of whether there is a blanket rule that prevents the application of the NJCFA to franchises, it does not apply in this case.  Therefore, Count Three of Defendants' counterclaim must be dismissed.

### E.      Defendants' Breach of Contract Claim

In Count Five of their Counterclaim, Defendants bring a breach of contract claim.  To state a claim for breach of contract under New Jersey law, a plaintiff must allege: (1) the existence of a valid contract between itself and the defendant; (2) that the defendant materially breached the contract; and (3) the plaintiff suffered damages as a result of the breach.  *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.,* 421 F. Supp. 2d 831, 833 (D.N.J. 2006) (citing *Coyle v. Englander's,* 488 A.2d 1083 (N.J. Super. Ct. App. Div. 1985)).  Here, Defendants claim that the YFF Parties have "failed to perform their contractual obligations."  Countercl. ¶ 93.  However, while Defendants have named the entirety of the YFF Party as having breached their contractual obligations, the Counterclaim lacks any allegations of a contract that existed between Mastro and any of the Defendants, and YWI is not a party to either the Galloway or Manahawkin Franchise Agreements.  Likewise, Defendants have not properly alleged a contractual obligation that YFF itself has breached in either the Galloway or Manahawkin Franchise Agreements.

---

[8] Here, even if the Court were to follow the reasoning of *Kavky*, Defendants' argument that the advertisement of an offer to purchase a franchise on the internet necessarily makes such an offer fall into the gambit of the NJCFA would make a narrow exception swallow the rule.  It is axiomatic that franchisors advertise franchising opportunities on the internet; to hold that doing so makes such an offer fall into the NJCFA would essentially mean that any offer to a franchisee falls into the NJCFA.

While such claims may exist, Defendants' Counterclaim has couched those allegations in tort theories, leaving the Court to speculate as to what provisions of either Agreement were breached.

Defendants, however, have alleged that Petruzzi is contractually obligated to pay "Ying the remaining $140,000 he owes Ying for the Galloway Store." Countercl. ¶ 92. This allegation appears to be in reference to the allegation that Petruzzi and Ying entered into an agreement where Petruzzi would buy back the Galloway Store from Ying for a set amount of money. *See* Countercl. ¶ 33. Defendants, however, have failed to appropriately allege any facts that a breach of contract occurred; rather, all that is alleged is that there was a contract and that Ying is owed certain damages. Defendants' allegation that "Counterclaim Defendants have failed to perform their contractual obligations" is merely a legal conclusion, and is thus not entitled to the assumption of truth. Overall, Count Five must be dismissed.

### F.      Canon-Ying's Claims for Malicious Use and Abuse of Process

In Count Six, Defendant Canon-Ying asserts counterclaims for malicious use of process and abuse of process against YFF. Canon-Ying's claims stem from the filing of a claim against her for tortious interference in the Complaint. To state a claim for malicious use of process under New Jersey law, Canon-Ying must allege (1) a proceeding instituted against the plaintiff without probable cause (2) with malice, (3) the proceeding was terminated favorably to the plaintiff, and (4) a "special grievance" as suffered. *See Turner v. Wong*, 363 N.J. Super. 186, 203-04 (App. Div. 2003). "The absence of any one of these elements is fatal." *Brien v. Lomazow*, 227 N.J. Super. 288, 300 (App. Div. 1988) (internal citation omitted). This claim must be dismissed, therefore, because the claims against Canon-Ying have not yet been determined or otherwise terminated in her favor.

On the other hand, "[t]he tort of malicious abuse of process lies not for commencing an improper action, but for misusing or misapplying process after it is issued." *Hoffman v. Asseenontv.Com, Inc.*, 404 N.J. Super. 415, 431-32 (App. Div. 2009).  Therefore, courts must focus on "not what prompted the suit but what action plaintiff engaged in after the commencement of the action."  *Id.* In order to state a claim for malicious abuse of process, a party must allege "that the defendant perform[ed] 'further acts' after issuance of process which represent the perversion or abuse of the legitimate purposes of that process. *Baglini v. Lauletta*, 338 N.J. Super. 282, 294 (App. Div. 2001) (internal quotation omitted). Examples of appropriate "further acts" that could establish an abuse of process tort include "attachment, execution, garnishment, sequestration proceedings, arrest of the person and criminal prosecution and even such infrequent cases as the use of a subpoena for the collection of a debt." *Id.* (citation omitted).  Here, Defendant's claim is not for the misuse of any subsequently issued process, but rather for the filing of a claim against her at all.  *See* Countercl. ¶ 97.  Even if YFF's claim against Canon-Ying is inspired by a malicious or improper motive, as alleged, "that in itself is not sufficient to sustain a complaint for malicious abuse of process." *Penwag Property Co. v. Landau*, 148 N.J. Super. 493, 498 (App. Div. 1977).  Therefore, Defendant Canon-Ying's claim for malicious abuse of process cannot stand.  Accordingly, Count Six is dismissed.

**V.**     **Conclusion**

The YFF Parties' motion to dismiss Defendants' Counterclaim is granted.[9]  The claims, however, will be dismissed without prejudice.  To the extent the deficiencies can be cured by way of amendment, Defendants are granted thirty days to file an Amended Counterclaim solely

---

[9] The YFF Parties also moved to strike the jury demand by Defendants and to dismiss the claims for multiple and exemplary damages by Ying "to the extent that any of Defendants' claims survive. . . ."  *See* Br. at 41, 42.  Because no claims have survived this Motion, the Court will accordingly not decide these matters.

for the purposes of amending such claims. An appropriate Order accompanies this Opinion.

/s/ Joel A. Pisano
JOEL A. PISANO, U.S.D.J.

Dated: May 5, 2014