NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| YOGO FACTORY FRANCHISING, INC., : : Plaintiff, : : v. : : EDMOND YING, et al., : : Defendants. : : and : : EDMOND YING, et al. : : Counterclaimants, : : v. : : YOGO FACTORY FRANCHISING, INC., et al., : : Counterclaim Defendants. : | Civil Action No. 13-630 (FLW) (TJB) **OPINION** |

WOLFSON, District Judge.

This matter comes before the Court on a motion by Plaintiff/Counterclaim Defendants Yogo Factory Franchising, Inc. ("YFF"), Yogurt Werks, Inc. ("YWI"), Brian Petruzzi, and Ryan Mastro to dismiss the amended counterclaim of Defendants/Counterclaimants Edmond Ying, Nancy Canon-Ying, and OMG Froyo, LLC, pursuant to Fed. R. Civ. P. 12(b)(6) and/or Fed. R. Civ. P. 9(b). In its Complaint, YFF, a franchisor, has brought claims for trademark infringement, unfair competition, misappropriation of trade secrets, breach of a certain franchise agreement, and tortious interference against Defendants, a franchisee, his wife, and a company formed and owned by his wife. Defendants have amended an earlier counterclaim, the basis of which is that

the YFF Parties fraudulently induced Ying into entering into three franchise agreements. The YFF Parties now move to dismiss this Amended Counterclaim. The Court decides this matter without oral argument pursuant to Fed. R. Civ. P. 78(b). For the reasons set forth below, the YFF Parties' Motion to Dismiss Defendants' Amended Counterclaim is granted.

## I. Procedural History and Background

Yogurt Werks, Inc. ("YWI") is a New Jersey corporate entity organized in June 2011, and is an affiliate of Yogo Factory Franchising, Inc. ("YFF"). Organized in February 2012, YFF is a franchisor of the Yogo Factory franchise system (the "System"), offering the right to open and operate frozen yogurt stores under the licensed mark Yogo Factory. Brian Petruzzi ("Petruzzi") is alleged to be the CEO and president of YFF, a position he has held since YFF's inception in February 2012, as well as the president and CEO of YWI. Ryan Mastro ("Mastro") is YFF"s Franchise Coordinator, and has served in that position since YFF's inception in February 2012. Defendant Edmond Ying ("Ying"), individually, entered into three Franchise Agreements with YFF and/or YWI to open and operate three Yogo Factory stores. OMG Froyo, LLC ("OMG Froyo") is a company formed by Nancy Canon-Ying ("Canon-Ying"), Ying's wife, in November 2012.

On January 31, 2013, Plaintiff YFF filed suit against Ying, Canon-Ying, and OMG Froyo (together, "Defendants" or "Counterclaim Plaintiffs") for (1) breach of a Franchise Agreement dated June 5, 2012; (2) infringement of trademarks; (3) unfair competition; (4) misappropriation of trade secrets and other confidential information; and (5) tortious interference with contractual obligations. On March 15, 2013, Defendants filed an Answer and Counterclaim against YFF, YWI, Mastro, and Petruzzi (together, the "YFF Parties" or "Counterclaim Defendants"). Thereafter, the YFF Parties moved to dismiss the Counterclaim. On May 5, 2014, the Honorable

Joel A. Pisano, U.S.D.J. (retired),[1] entered an Order and Opinion (the "Opinion") dismissing Defendants' Counterclaim in its entirety.  In the Opinion, the Court concluded: "To the extent the deficiencies can be cured by way of amendment, Defendants are granted thirty days to file an Amended Counterclaim solely for the purpose of amending such claims." Op. 23–24.  Notably, the Court did not grant Defendants leave to file additional claims.

On June 9, 2014, Defendants filed their Amended Counterclaim, which is nearly identical to the dismissed Counterclaim, but includes an additional claim for breach of fiduciary duty against YWI.  Accordingly, because the allegations found within the Amended Counterclaim are nearly identical to those within the Counterclaim, this Court incorporates the factual background contained within the Opinion here and expands only on any new and relevant factual allegations briefly below.  Specifically, Defendants have added relevant allegations as to only two of the three stores franchised by Defendant Ying from the YFF Parties.  In other words, there are no relevant differences in the Amended Complaint as it pertains to the first store franchised by Defendant Ying in Howell, New Jersey (the "Howell Store").  There are, however, some factual allegations that differ between the Amended Counterclaim and the Counterclaim in regards to the Yogo Factory stores in Galloway, New Jersey (the "Galloway Store") and Manahawkin, New Jersey (the "Manahawkin Store").

A. *The Galloway Store*

During April 2012, Petruzzi and Ying entered into an agreement for Ying to purchase Petruzzi's personally-owned Yogo Factory store in Galloway, New Jersey (the "Galloway Store").  Defendants allege that Petruzzi made certain representations to Ying about the Galloway Store before he purchased it that are not found within the franchise disclosure

---

[1] Due to the retirement of Judge Pisano, this case has been reassigned to the Honorable Freda L. Wolfson, U.S.D.J.

document (the "FDD"). These representations include (1) information about the existing yearly sales of Yogo Factory System franchisees, as well as information regarding existing costs of goods sold and yogurt costs; (2) that YWI would provide "appropriate and effective advertising"; (3) that the franchisees did not need retail experience to succeed; that the Yogo Factory brand, name, marks, and system was being developed and promoted; (4) that YWI would provide "appropriate, effective pre-opening services," as well as support after the franchise stores were opened, including an "intensive pre-opening and post-opening training program, and assistance in all aspects of the franchise operation including a detailed operations manual"; and (5) that prospective franchisees could rely upon the sales and financial information provided to them. *See* Am. Countercl. ¶ 22.

On or about April 2, 2012, Mastro emailed Ying a franchise disclosure document (the "Galloway FDD") for his review. The Galloway FDD "summarizes certain provisions of [the] franchise agreement and other information in plain English." *See* Am. Countercl. Ex. C, at 1. While the Galloway FDD is lengthy, only a few provisions are relevant for this motion. First, in Item 3 of the Galloway FD, the potential franchisee is informed that Petruzzi was involved in two prior litigations. *See id.* at 4. Next, Item 7 of the Galloway FDD estimates the initial investment funds necessary to open a Yogo Factory store, but cautions that the numbers listed are estimates only and there is no guarantee that a franchisee's costs will fall within the stated ranges. The Galloway FDD advises the potential franchisee that he or she is responsible for obtaining certain insurance policies, including workers' compensation insurance. *Id.* at 11. The Galloway FDD reminds the potential franchisee that estimates are for initial start-up costs only, and do not include ongoing costs for things such as marketing and advertising expenses. *Id.* at 12. In Item 11, the Galloway FDD states that the franchisor will provide a training program to

the franchisee and its manager, and that it may provide other training programs after the opening of the franchisee store, if deemed advisable. *Id.* at 20, 22–23. It also states that an operations manual will be provided. *Id.* at 24.

In Item 19 of the Galloway FDD, certain financial performance representations are made, pursuant to the Federal Trade Commission's ("FTC") Franchise Rule. The Section explains that "financial performance information that differs from that included in Item 19 may be given only if . . . a franchisor provides the actual records of an existing outlet you are considering buying." *Id.* at 38. It explains that the historical performance representation is based upon the two affiliate-owned stores in New Jersey, which have limited operating history, having first opened in 2011. It also states that there are no currently franchised locations as of February 2012. The Section later emphasizes this point:

> CAUTION: ONLY THE TWO COMPANY STORES LISTED IN THIS ITEM ACHIEVED THE REPORTED RESULTS. YOUR INDIVIDUAL RESULTS MAY DIFFER. THERE IS NO ASSURANCE YOU WILL SELL AS MUCH OR THAT YOUR COSTS AND EXPENSES WILL NOT EXCEED THOSE PROVIDED IN THIS ITEM.
>
> YOU ARE STRONGLY ADVISED TO CONDUCT AN INDEPENDENT INVESTIGATION OF THE COSTS AND EXPENSES YOU WILL INCUR IN OPERATING YOUR FRANCHISED BUSINESS.

*Id.* at 41. The Section twice cautions that "we do not make any representations about any Store's past, current or future financial performance. . . . We do not authorize our employees or representatives to make any such representations either orally or in writing." *Id.* at 38, 41. The only exception made is "[i]f you are purchasing an existing Store . . . we may provide you with the actual records of that store." *Id.* The Section also takes care to list different ways in which sales or costs may be affected. *Id.* at 40–41. It stresses that the franchisor "cannot and do[es] not guarantee that you will not have different or additional expenses starting your business." *Id.*

5

at 10, 12. It suggests, numerous times, for a potential franchisee to review the figures with a business advisor before making a decision to purchase the franchise. *Id.* at 1, 10, 12, 38, 41.

Along with the Galloway FDD, Defendants allege that Mastro emailed to Ying the Galloway Store's cash flow and expense statements on April 23, 2012 to "further persuade Ying" to purchase the store. Am. Countercl. ¶ 28. These statements suggested that the Galloway Store's financial performance was "outstanding." *Id.* at ¶ 29. Defendants allege that Petruzzi and Mastro both represented to Ying that the Galloway Store was "'turn key' in that its staff could operate the location on their own with little to no supervision" and that Ying could therefore be an "absentee franchisee-owner." *Id.* at ¶ 26.

Defendants allege that Ying entered into a "Business Sale Agreement" with Petruzzi to purchase the Galloway Store for $650,000 on April 25, 2012. Ying thereafter delivered $325,000 to YFF on April 29, 2012. *See id.* at ¶¶ 30, 33. Defendants allege that Ying never signed a franchise agreement for the Galloway Store, and only signed the Business Sale Agreement ("BSA"). The BSA states that, "[e]xcept for the exhibits hereto or the documents and papers delivered by Seller to Buyer in connection with the Agreement herewith, there are no agreements, representations, warranties, covenants by or among the parties hereto with respect to the subject matter hereof . . . ." *See* Am. Countercl. Ex. B, at 4. The BSA also has an integration clause, which provides that "this Contract contains the entire agreement and there are no other promises or conditions in any other agreement whether oral or written concerning the subject matter of this Contract. This Contract supersedes any prior written or oral agreements between the parties." *Id.* at 6. The BSA also has an arbitration clause: "Any dispute arising under this contract shall be resolved under the commercial arbitration rules of the American Arbitration Association . . . ." *Id.* at 5. Finally, the BSA contains a "buy back" provision, under which

"[t]he buyer offers the seller to buy back this business at same cost + lease hold improvement if any within 1 year from the date of this contract." *Id.* at 6.

After approximately a month of operating the Galloway Store, Ying became frustrated with the performance of the store. Defendants also allege that Petruzzi and Mastro were "unwilling to provide audited financials of the past performances as requested numerous times by Ying – even though they promised to do so." Am. Countercl. ¶ 34. Defendants allege that Petruzzi agreed to buy the Galloway Store back from Ying for $650,000. *Id.* at ¶ 35. Petruzzi was obligated to return Ying's $325,000 in monthly payments of $27,083. Defendants allege that Petruzzi still owes Ying approximately $140,000 from this transaction.

  B.  *The Manahawkin Store*

On or about June 2, 2012, Ying entered into another Franchise Agreement with YFF, in which he was granted the right to open and operate a third Yogo Factory store in Manahawkin, New Jersey (the "Manahawkin Store"). Ying was allegedly not given a FDD prior to his purchase of the Manahawkin Store. Defendants allege that, on or about June 2, 2012, Petruzzi and Mastro made the same eight representations to Ying "to induce him into purchasing another franchise." Am. Countercl. at ¶ 38. Defendants allege for the first time that Ying signed only a signature page for the Manahawkin Franchise Agreement ("MFA"), and "was never presented with or received a complete [MFA] at this time . . . ." *Id.* at 40. Defendants, however, do not dispute that Ying entered into the form Franchise Agreement attached as Exhibit B to the Complaint, nor do they dispute that the complete form Franchise Agreement was attached as Exhibit F to the 2012 FDD, which Defendant Ying acknowledges having received prior to signing the MFA.

7

Contained within the MFA is a provision that the written contract constitutes the entire agreement between the parties and that "no other representations hav[e] induced you to execute this Agreement," but that "nothing in this Agreement is intended to disclaim the representations YFF made in the franchise disclosure document YFF furnished to you." Another provision states that the franchisee has conducted an independent investigation of the franchise business, and realizes the business venture involves risk. It continues:

> Your success in this business is not guaranteed, is speculative and depends, to an important extent, upon your ability as an independent business person. YFF does not represent or warranty that the Store will achieve a certain level of sales or be profitable. . . .YFF expressly disclaims the making of, and you acknowledge you have not received, any warranty or guarantee, express or implied, as to the potential volume, profits or success of the business venture contemplated by this Agreement.

*See* Compl. Ex. B, at 46–47. The form Franchise Agreement contains a "franchise disclosure questionnaire" that Ying signed on June 5, 2012. Defendants allege in the Amended Counterclaim that Mastro and Petruzzi "instructed Ying how to fill out the disclosure questionnaire." Am. Countercl. ¶ 42. The questionnaire asks the following questions:

> Has any employee or other person speaking on behalf of YFF made any statement or promise concerning the revenue, profits or operating costs of YFF [*sic*] store or business operated by YFF or its franchisees except as expressly provided in Item 19 of the Franchise Disclosure Document?
>
> Has any employee or other person speaking on behalf of YFF made any statement or promise concerning a Yogo Factory store, kiosk or cart that is contrary to, or different from, the information contained in the Disclosure Document?
>
> Has any employee or other person speaking on behalf of YFF made any statement or promise regarding the amount of money you may earn in operating a Yogo Factory store or business?
>
> Has any employee or other person speaking on behalf of YFF made any statement, promise or agreement concerning the advertising, marketing, training, support service or assistance that YFF will furnish to you that is contrary to, or different from, the information contained in the Disclosure Document?

8

Ying answered "No" to each of these questions.  The questionnaire also asked if the franchisee "understand[s] that the approval of YFF of the Approved Store Location for a Yogo Factory store does not constitute an assurance, representation, or warranty of any kind as to the successful operation or profitability of a Yogo Factory store at the Approved Store Location?"  Ying answered "Yes" to this question.  *See* Compl. Ex. B, at Ex. 8.  The Manahawkin Store opened on August 11, 2012.

## II.     Standard of Review

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a counterclaim "for failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  When reviewing a motion to dismiss, courts must first separate the factual and legal elements of the claims, and accept all of the well-pleaded facts as true.  *See Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009).  All reasonable inferences must be made in the plaintiff's favor.  *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 314 (3d Cir. 2010).  In order to survive a motion to dismiss, the plaintiff must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  This standard requires the plaintiff to show "more than a sheer possibility that a defendant has acted unlawfully," but does not create as high of a standard as to be a "probability requirement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Third Circuit has required a three-step analysis to meet the plausibility standard mandated by *Twombly* and *Iqbal*.  First, the court should "outline the elements a plaintiff must plead to a state a claim for relief."  *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).  Next, the court should "peel away" legal conclusions that are not entitled to the assumption of truth.  *Id.*; *see also Iqbal*, 556 U.S. 678–79 ("While legal conclusions can provide the framework of a

9

complaint, they must be supported by factual allegations."). It is well-established that a proper complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal quotations and citations omitted). Finally, the court should assume the veracity of all well-pled factual allegations, and then "determine whether they plausibly give rise to an entitlement to relief." *Bistrian*, 696 F.3d at 365 (quoting *Iqbal*, 556 U.S. at 679). A claim is facially plausible when there is sufficient factual content to draw a "reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The third step of the analysis is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

In addition, Rule 9(b) requires that "in all averments or fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. P. 9(b). Rule 9(b)'s heightened pleading standard for fraud claims is meant "to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." *Seville Indus. Mach. v. Southmost Mach.*, 742 F.2d 786, 791 (3d Cir. 1984). In general, the complaint must describe the "who, what, when, where and how of the events at issue." *In re Rockefeller Ctr. Props. Secs. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (citations and quotations omitted).

Generally, our task in assessing a motion to dismiss requires it to disregard any material beyond the pleadings. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). The court, however, may consider "a document integral to or explicitly relied upon in the complaint," whether or not the document is attached to the challenged pleading. *Id.* (internal quotation marks and citation omitted). Furthermore, a court need not accept allegations

as true that are contradicted by the documents upon which a party's claims are based. *See Warburton v. Foxtons, Inc.*, Civil Action No. 04-2474, 2005 U.S. Dist. LEXIS 39615, at *10 (D.N.J. June 13, 2005) (citing *Genesis Bio-Pharmaceuticals, Inc. v. Chiron Corp.*, 27 F. App'x. 94, 99–100 (3d Cir. Jan. 10, 2002)).

### III.    Discussion

Defendants were granted leave to file an Amended Counterclaim only to the extent that such amendment could cure any deficiencies identified in the Counterclaim by the Court. To that end, Defendants' new counterclaim in Count VII for breach of fiduciary duty must be dismissed, without prejudice, as Defendants were not granted leave to file any additional claims. The Court now turns to the merits of the Amended Counterclaim.

#### A.    *The Howell Store Franchise Agreement and BSA Arbitration Clause*

The Court previously dismissed all claims related to the Howell Store, finding that Defendants' contractual, tort, and statutory claims fell within the scope of the arbitration clause within the Howell Franchise Agreement. Defendants, in both their Amended Counterclaim and Opposition brief, have disregarded the Court's holding and re-alleged the same claims relating to the Howell Franchise Agreement, premised on the same argument that the arbitration provision contained within the Howell Franchise Agreement applies only to contractual claims. The Court, however, has already found that Defendants' tort, statutory, and contractual claims fall within the scope of the Howell Franchise Agreement. Accordingly, the Court once again dismisses these claims.

Likewise, the Court also must dismiss all claims—contractual, statutory, and tort— related to the BSA. The Governing Law provision of the BSA specifies that "[a]ny dispute arising under this contract shall be resolved under the commercial arbitration rules of the

American Arbitration Association." *See* Am. Countercl. Ex. B, at 5. As the Court has already explained, phrases such as "arising under" in arbitration provisions are given broad construction by the Third Circuit. *See Battaglia v. McKendry*, 233 F.3d 720, 727 (3d Cir. 2000). Accordingly, here, where "the allegations underlying the claims touch matters covered by [the arbitration provision]," *Brayman Constr. Corp v. Home Ins. Co.*, 319 F.3d 622, 626 (3d Cir. 2003), the Court must dismiss all claims relating to the BSA because the claims must be submitted to arbitration in accordance with the terms of the parties' agreement.

        B.      *Defendants' Fraud, Civil RICO, and Negligent Misrepresentation Claims*

In its Opinion, the Court dismissed Defendants' claim for fraud, finding that Defendants had failed to meet the pleading requirements of Rule 9(b), and, regardless, had failed to plausibly state a claim for fraud. As discussed, Defendants' claims relative to both the Howell Franchise Agreement and the BSA are dismissed pursuant to the terms of the arbitration provisions contained within each agreement. Accordingly, the Court is left with allegations relating to the Manahawkin Franchise Agreement ("MFA"). The Court finds that, even considering the new allegations contained within the Amended Counterclaim and assuming that Defendants have met the heightened pleading requirements under Rule 9(b), Defendants have failed to plausibly state a claim for fraud. Indeed, the Amended Counterclaim contains no new or additional factual allegations that impact or otherwise affect the Court's earlier decision.[2] Accordingly, for the reasons explained in detail in the Opinion, Defendants' fraud claim fails because Defendants have failed to plausibly allege that Ying's reliance on any of the alleged misrepresentations was reasonable. For the same reasons, Defendants' claims for negligent misrepresentation and civil

---

[2] While Defendants now assert that Defendant Ying "was never presented with or received a complete [MFA]" when he physically signed the MFA, *see* Am. Countercl. ¶ 40, Defendant Ying freely and willingly entered into the MFA and is bound by its terms. There are no allegations that Defendant Ying did not enter into the MFA, or otherwise challenges the applicability of its terms to him.

12

RICO must also be dismissed. Accordingly, Counts I, II, and IV of the Amended Counterclaim are dismissed.

    C.    *Defendants' Breach of Contract Claim*

In Count V of their Amended Counterclaim, Defendants assert a breach of contract claim. As discussed, all claims for breach of contract against YWI in connection with the Howell Agreement must be dismissed and submitted to arbitration. Likewise, all claims for breach of contract alleged against Petruzzi for failure to make payments pursuant to the alleged buy-back agreement must be dismissed and submitted to arbitration pursuant to the arbitration provision within the BSA. Defendants do not allege the existence of any other agreement between any of the Defendants and YWI or Mastro; accordingly, any claims for breach of contract against YWI or Mastro are dismissed.

Therefore, any breach of contract claim must stem from the MFA between YFF and Ying, as Defendants have pled the existence of no other contractual agreement. In their Amended Counterclaim, Defendants have alleged that YFF has "breached [its] obligations" by:

    (a) Failing [to] provide appropriate and effective advertising for franchisees;
    (b) Failing to furnish specifications for the build-out of a standard store and, through the use of its hand-picked contractors, the build out would be efficient and effective;
    (c) Failing to aggressively promote the Yogo Factory brand and expand it;
    (d) Failing to provide appropriate, effective pre-opening services, including site selection and lease negotiation assistance, demographic studies and site ranking, financing assistance, store layout, design and architectural assistance;
    (e) Failing to continue to develop, promote and protect the good will and reputation associated with the Yogo Factory name, marks and the Yogo Factory system; and
    (f) Failing to provide complete support, including an intensive pre-opening and post-opening training program, and assistance in all aspects of the franchise operation including a detailed operations manual.

Am. Countercl. ¶ 99.

These obligations, however, are not contained within the MFA.  For example, the MFA specifies that YFF is not obligated to administer the advertising fund or any future developed advertising fund, is not obligated to make expenditures for Ying that are equivalent to or proportionate to the franchisee's contributions to the advertising fund, or to ensure that any particular franchisee benefits directly or pro rata from expenditures from the advertising fund. *See* Compl. Ex. B, at Section 13.6.1.  Likewise, YFF has no contractual obligations to furnish specifications for a build-out of a standard store or provide effective pre-opening services; indeed, the MFA expressly states that the franchisee assumes "all cost, liability, expense and responsibility for locating, obtaining and developing a site for the Store, and for constructing and equipping the Store."  *See id.* at Section 4.1.1; *see also id.* at Section 4.1.5 (providing that YFF is not responsible for delays in the construction, equipping, or decorating of the Yogo Factory Store because YFF has no control over the relevant landlord or developer, as well as no control over the potential construction or related problem that could occur and delay the Store opening).

The only relevant contractual obligations of YFF contained within the MFA were to (a) provide Ying with YFF's then-current, generic, prototypical plans for a typical Yogo Factory Store, including a sample layout for the interior of a typical franchised location, *see id.* at Section 6.1.1; (b) provide Ying with an initial training program for Ying and the relevant Store's manager prior to opening the Yogo Factory Store, *see id.* at Section 6.1.2; (c) provide to Ying, on loan, one copy of the confidential Operating Manual, *see id.* at Section 6.1.4; and (d) provide Ying with information and identification of sources to purchase products, inventory, signage, and store collateral materials, *see id.* at Section 6.1.5.  Defendants have failed to allege that these contractual obligations—or any other obligations agreed to by YFF—were breached.  YFF simply cannot be found liable for alleged contractual obligations that have no basis in the

underlying agreement between the parties. Accordingly, because Defendants have failed to allege a material breach of the MFA, or any other agreement, their breach of contract claim must be dismissed.

### D. *Defendants' Remaining Claims*

Finally, the Court turns to Defendants' remaining claims. First, Defendants have reasserted their claim for a violation of the NJCFA in Count III of the Amended Counterclaim. The Court, however, held in the Opinion that the NJCFA does not apply to the offer or sale of franchises such as the Yogo Factory franchise opportunity.[3] Defendants have completely disregarded this holding and have reasserted their NJCFA claim based on identical allegations and arguments. Accordingly, for the reasons set forth in the Opinion, Defendants' NJCFA claim is dismissed.

Likewise, Defendant Nancy Canon-Ying's claims for malicious use and abuse of process in Count IV are also dismissed. The Court had previously dismissed these claims, finding that Defendant Canon-Ying's claim for malicious use of process failed because the claims against Canon-Ying had yet to be determined in her favor, a necessary element of the cause of action. The Court held that Defendant Canon-Ying's claim for malicious abuse of process must be dismissed because Canon-Ying's claim was not for the misuse of any subsequent issued process, but for the filing of a claim against her generally. Accordingly, her claim failed as a matter of law. Defendants, however, have ignored the Court's holdings in the Opinion and have reasserted

---

[3] The Court is constrained, pursuant to the law of the case doctrine, from reconsidering this holding. "The law of the case doctrine limits the extent to which an issue will be reconsidered once the court has made a ruling on it." *Fagan v. City of Vineland*, 22 F.3d 1283, 1290 (3d Cir. 1994). In other words, once a court decides upon a rule of law, that decision should govern the same issues subsequently in the same case. The doctrine stems from the belief that a successor judge should not, as a measure of comity, "lightly overturn decisions of his predecessors in a given case." *Fagan*, 22 F.3d at 1290.

these claims based on identical factual allegations as the original Counterclaim.  Thus, the Court once against dismisses Defendant Canon-Ying's claims for malicious use and abuse of process.

## IV.    Conclusion

Defendants' Amended Counterclaim is largely identical to the Counterclaim that was already dismissed in its entirety by the Court, and fails to assert any factual allegations that change or otherwise affect the Court's earlier Opinion.  Indeed, Defendants appear to have disregarded the Court's instructions to file an Amended Counterclaim solely for the purpose of curing the noted deficiencies, but rather used the Amended Counterclaim as an attempt to have the Court reconsider its earlier Opinion.  Without any new factual allegations, however, Defendants' Amended Counterclaim once again fails and must be dismissed in its entirety.[4]  Accordingly, and for the foregoing reasons, the YFF Parties' Motion to Dismiss Defendants' Amended Counterclaim is granted.  An appropriate Order accompanies this Opinion.

/s/ Freda L. Wolfson
FREDA L. WOLFSON, U.S.D.J.

Dated:  March 10, 2015

---

[4] Once again, because the Court has dismissed the Amended Counterclaim in its entirety, it will not decide the YFF Parties' motion to strike the jury demand and to strike the claims for multiple and exemplary damages by Defendants.